IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL KENDOLL,

                Plaintiff,

      v.

STATE OF OREGON, JOSH BROOKS, in his
individual and official capacity, and ALEX
GARDNER, in his individual and official capacity,

                Defendants.

Case No.: 3:24-cv-00330-AN

OPINION AND ORDER

Plaintiff Michael Kendoll brings this action against defendants State of Oregon ("the State"), Josh Brooks ("Brooks"), and Alex Gardner ("Gardner"). Plaintiff brings five claims: (1) two counts of a civil rights claim based on 42 U.S.C. § 1983, for violations of plaintiff's procedural and due process rights and right to equal protection; (2) a civil rights claim based on 42 U.S.C. § 1983, for violation of plaintiff's First Amendment rights to freedom of association and to be free from retaliation for exercising the right to freedom of association; (3) a discrimination claim based on the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2); (4) a common law wrongful discharge claim; and (5) a negligence *per se* claim based on Oregon Revised Statutes ("ORS") §§ 181A.710 and 181A.68 and 43 U.S.C. § 1985(3). On April 18, 2024, defendants filed a partial motion to dismiss, seeking to dismiss all of plaintiff's claims except the FMLA claim. For the reasons set forth below, defendants' motion is GRANTED, and all claims against defendants except plaintiff's third claim for relief, the FMLA claim, are DISMISSED.

**LEGAL STANDARD**

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most

favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inference from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

At the motion to dismiss stage, a court's review is limited to the face of the complaint, *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1482 (9th Cir. 1991), any documents referenced in the complaint "whose authenticity no party questions," *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (citation omitted), and any matters of which the court may take judicial notice, such as public records and "records and reports of administrative bodies," *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (citation omitted), *abrogated by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991); *see Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (noting that a court ruling on a 12(b)(6) motion to dismiss may consider "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice[,]" as well as "a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned").

2

# BACKGROUND

## A.     Factual Background

Plaintiff was employed by the State as a trooper with the Oregon State Police ("OSP") from approximately March 2013 to October 2022.  First Am. Compl. ("FAC"), ECF [12], ¶¶ 2, 4.  In October 2020, an anonymous caller informed the Portland Patrol Office that her boyfriend, an OSP employee, had observed plaintiff having sex in his patrol car at a Fred Meyer parking lot while on duty the May prior.  *Id.* ¶¶ 8, 11, 16.  OSP commenced an investigation, and OSP Lieutenant "J.F." interviewed plaintiff on November 2, 2020.  *Id.* ¶¶ 11-12.  Plaintiff was represented at this interview by both his union representative from the Oregon State Police Officers' Association ("OSPOA") and a non-union attorney from the Fraternal Order of Police Legal Defense Fund ("FOP LDF"), which is a self-funded benefits plan that provides attorneys to covered officers who are members of the Fraternal Order of Police.  *Id.* ¶¶ 5-6, 12.  The interview lasted approximately twelve minutes, and the original information identified the wrong Fred Meyer.  *Id.* ¶ 12.  The complaint was dismissed, and the investigation closed, for lack of corroborating evidence of inappropriate conduct.  *Id.* ¶ 13.

In the following months, plaintiff began to receive harassing and threatening phone calls and text messages from an anonymous person or persons, including messages such as: "We know ur name Mr. Kendel…now payback gonna suck for u and your loved ones." *Id.* ¶ 15.  Plaintiff was concerned that the harassment could be related to his work in Portland during the 2020 protests, and he reported the calls and texts to the Clackamas County Sheriff's Office ("CCSO").  *Id.* ¶¶ 14-15.  CCSO commenced an investigation and identified an OSP dispatcher, "S.D.," as a suspect.  *Id.* ¶ 16.  CCSO interviewed S.D., who admitted to the harassment and confessed to using third-party apps to conceal her identity.  *Id.*  S.D. also told CCSO that she was the anonymous complainant who had reported plaintiff's alleged misconduct to the Portland Patrol Office in October.  *Id.*  She further admitted that she had not been completely truthful in her report, that she herself was the woman with whom plaintiff had engaged in unprofessional conduct, and that her motivation in making the complaint was to get plaintiff into trouble.  *Id.*

The State did not inform plaintiff that his harasser had come forward, bring criminal

charges against S.D., or investigate S.D. further for harassment.  *Id.* ¶ 17.  Instead, the State subsequently promoted S.D., who reportedly bragged about the situation, including "that she was not disciplined because she feigned mental health issues."  *Id.*  CCSO closed the criminal investigation.  *Id.* ¶¶ 17-18.

        The State then reopened the internal investigation into plaintiff.  *Id.* ¶ 18.  Lieutenant J.F. interviewed S.D. on the same day as CCSO, and S.D. told Lieutenant J.F. during that interview that she had met plaintiff in a Fred Meyer parking lot and entered his car, where they kissed for some time.  *Id.*  S.D. provided Lieutenant J.F. with Facebook messages between herself and plaintiff wherein they playfully discuss kissing and making out in plaintiff's car.  *Id.*  On or about January 12, 2021, plaintiff was placed on administrative leave pending the results of the investigation.  *Id.* ¶ 19.

        On or about March 12, 2021, OSP Lieutenant "R.M.," who had assumed responsibility for the investigation, interviewed plaintiff a second time.  *Id.* ¶ 20.  At this interview, plaintiff was again represented by both an OSPOA representative and his FOP LDF attorney.  *Id.*  Plaintiff confirmed that he had been on duty the night in question; that he knew S.D.; that he and S.D. had dated; and that he had communicated with S.D. using Facebook.  *Id.*  Plaintiff "disclaimed memory of S.D. being in his car but acknowledged he may have kissed her outside the car in the parking lot"; "disclaimed memory of a prolonged kissing session and further disclaimed any sexual or inappropriate contact"; and "disclaimed memory of the Facebook messages."  *Id.*

        On or about March 16, 2021, plaintiff was diagnosed with post-traumatic stress disorder ("PTSD") by a licensed doctor.  *Id.* ¶ 21.  Plaintiff reported experiencing symptoms of sleep disturbance, nightmares, recurring thoughts, fatigue, and memory loss.  *Id.*  Plaintiff alleges that he was "positive for memory loss."  *Id.*

        On or about May 3, 2021, an OSP captain completed a finding of fact in which he sustained two allegations against plaintiff: that plaintiff had (1) engaged in inappropriate sexual conduct while on duty and (2) been dishonest in his first interview.  *Id.* ¶ 22.  On or about May 24, 2021, the State accepted a response to the finding of fact from plaintiff's FOP LDF attorney.  *Id.* ¶ 23.

        On or about May 25, 2021, plaintiff was diagnosed with "[PTSD] by history" by a licensed

psychologist. *Id.* ¶ 24.

        On or about June 17, 2021, the State issued a pre-termination letter to plaintiff. *Id.* ¶ 25; *see* Decl. Daniel E. Thenell Supp. Pl. Resp. ("Thenell Decl."), ECF [19], ¶ 3 & Ex. 1. On or about June 22, 2021, plaintiff filed a Report of Job Injury or Illness for PTSD with the State. FAC ¶ 26. On or about June 24, 2021, plaintiff's doctor signed the State's Federal and Oregon Family Medical Leave: Health Care Provider Certificate of Serious Health Condition, which stated that it was necessary for plaintiff to take full time leave from June 22, 2021, "until TBD." *Id.* ¶ 27. On or about July 14, 2021, the State signed plaintiff's Report of Job Injury or Illness. *Id.* ¶ 28. On or about August 19, 2021, plaintiff was diagnosed with PTSD by a different licensed psychologist via an Independent Medical Examination ("IME"). *Id.* ¶ 30. Plaintiff then applied for leave under the FMLA. *Id.* ¶ 31.

        On or about August 2, 2022, plaintiff attended a pre-dismissal hearing where he was represented by his FOP LDF attorney. *Id.* ¶ 29. On October 10, 2022, the State issued a notice of termination to plaintiff, effective October 31, 2022. *Id.*; Thenell Decl. Ex. 1.

        On or about November 3, 2022, plaintiff's FOP LDF attorney served an Appeal of Discharge to Arbitration on the State. FAC ¶ 29. On or about November 8, 2022, John Nees ("Nees"), the State Labor Relations Manager, responded to the request to arbitrate via an email to plaintiff's FOP LDF attorney wherein Nees refused to engage in arbitration. *Id.* ¶ 32. Also on or about November 8, plaintiff's FOP LDF attorney notified the Employment Relations Board ("ERB") of the appeal to arbitration and requested a list of arbitrators. *Id.* ¶ 33. On or about November 9, 2022, the ERB provided a list of arbitrators to both plaintiff's FOP LDF attorney and the State. *Id.* ¶ 34. The State's Department of Justice ("DOJ") legal representative, Sylvia Van Dyke ("Van Dyke"), responded to the ERB and requested that the list of arbitrators be withdrawn. *Id.* Plaintiff's FOP LDF attorney responded that the State "was estopped from relying on the exclusivity provisions because of their acceptance of plaintiff's representation by FOP LDF throughout the investigation and *Loudermill*."[1] *Id.* The FOP LDF attorney also provided Nees with a letter

---

[1] Plaintiff does not identify what *Loudermill* is or provide any accompanying case citation in any of his pleadings, nor is his argument regarding *Loudermill* clear from the face or context of the pleadings. *See* Thenell Decl. ¶ 2 ("Upon

outlining the legal and contractual support for plaintiff's right to arbitrate his claim. *Id.* ¶ 35.

Plaintiff alleges that his termination occurred around the same time as an investigation into high-ranking OSP Major "A.H." who was accused of having an inappropriate relationship with a subordinate. *Id.* ¶ 36. Major A.H. still works for the State. *Id.* Plaintiff alleges that OSPOA and OSP agreed that OSPOA "would drop its fight for the Major A.H. investigation, in exchange for the Deputy Superintendent of the [OSP], Josh Brooks, resolving six serious misconduct allegations against [the State's] employees[,]" including allegations that resulted in "sustained findings of insubordination, dishonesty, and sex on duty." *Id.* ¶ 37. Plaintiff alleges that the State did not notify the appropriate entities of the allegations, and that in the spring of 2023, Brooks "ordered a former [OSP] command staff member to shred an investigation involving one of the above six unnamed employees." *Id.* ¶¶ 37-38. Plaintiff also alleges that an OSP sergeant recently contacted the State's Office of Professional Standards ("OPS") for disciplinary information relating to one of the six unnamed employees. *Id.* ¶ 39. OPS sent the sergeant an email that contained the original finding of fact, including multiple serious allegations that sustained findings of untruthfulness. *Id.* Plaintiff alleges that a captain at OPS headquarters ordered a lieutenant to go into the sergeant's office and order the sergeant to delete the email with the findings, and then to go into the sergeant's email trash to delete the deleted email. *Id.*

On or about January 27, 2024, the OSPOA president issued a blog post stating that OSPOA would no longer allow any other entities to participate in investigations or anything involving the interpretation of OSPOA's collective bargaining agreement ("CBA"). *Id.* Plaintiff alleges that he has since "learned that OSPOA has begun a letter writing campaign to former members of the association that have opted, or 'Janus'd Out,' of OSPOA regarding use of outside entities to represent Troopers accused of wrongdoing." *Id.* ¶ 40. Plaintiff concludes that he "was punished and discriminated against for using an

---

information and belief, Defendants Alex Garnder [*sic*] and Josh Brooks were at the Loudermill."). This Court suspects that plaintiff's references are to *Cleveland Board of Education v. Loudermill*, a case in which the Supreme Court considered "what pretermination process must be accorded a public employee who can be discharged only for cause." 470 U.S. 532, 535 (1985). However, without further explanation of plaintiff's argument, the Court is unwilling to pontificate about how plaintiff may have intended to rely on *Loudermill* (if at all). Nonetheless, the Court notes that it considers this opinion and order to be entirely consistent with the principles set forth in that case.

attorney of his choosing." *Id.*

Plaintiff alleges that, because of his termination, he "cannot work in law enforcement" and "[e]ffectively his career is over." *Id.* ¶ 41. Plaintiff further alleges that "[h]is police certification has lapsed"; that "[b]ecause [he] cannot work in law enforcement, he is unable to attend training to restore his certification"; and that his "certification is under review for revocation due to his termination." *Id.* Plaintiff also alleges that he has "been listed as a Brady officer by the Clackamas County District Attorney[.]" *Id.*

**B.      Procedural Background**

Plaintiff filed this case in Marion County Circuit Court on January 30, 2024, and defendants removed the case to federal court on February 22, 2024. *See* Notice of Removal, ECF [1]. Plaintiff filed his First Amended Complaint ("FAC"), ECF [12], on March 28, 2024. Defendants filed the instant partial motion to dismiss on April 18, 2024. Defs. Partial Mot. to Dismiss ("Defs. Mot."), ECF [13].

The FAC is substantially similar to plaintiff's initial complaint. The primary amendment made was to name Brooks and Gardner as defendants and remove the State as a defendant regarding the constitutional claims.

## DISCUSSION

**A.      Additional Exhibits**

As an initial matter, plaintiff suggests that if the Court is inclined to grant defendants' motion, plaintiff should be given leave to amend the FAC to include the pre-termination and termination letters. *See* Thenell Decl. ¶ 5. These letters both appear to be signed by Gardner, *see id.* ¶¶ 2-3 & Exs. 1-2, and plaintiff presumably believes that they are sufficient to remedy the defects that defendants allege warrant dismissal. Because both letters are referenced in the FAC, *see* FAC ¶¶ 25 ("pre-termination letter"), 29 ("termination letter"), and defendants have not questioned their authenticity, *see* Defs. Reply Supp. Defs. Mot. ("Defs. Reply"), ECF [20], at 2, 11, the Court considers the letters at this stage. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1405 n.4 (citation omitted).

**B.      Constitutional Claims Brought Under Section 1983**

1.      *Eleventh Amendment Immunity*

Plaintiff asserts his section 1983 claims against Brooks and Gardner, who are named as defendants in both their individual and official capacities.  However, the Eleventh Amendment confers immunity upon states and their agencies from being sued, *Romano v. Bible*, 169 F.3d 1182, 1185 (9th Cir. 1999), and that immunity extends to state officials who are sued in their official capacities, *Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 967 (9th Cir. 2010).  For this reason, dismissal of plaintiff's section 1983 claims against Brooks and Gardner in their official capacities is appropriate.  *See Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 873 n.2 (9th Cir. 1987) (citation omitted) ("Like a jurisdictional bar . . . , the effect of the Eleventh Amendment must be considered *sua sponte* by federal courts.").  The Court thus addresses plaintiff's section 1983 claims only as they are asserted against Brooks and Gardner in their individual capacities.

2.      *Personal Participation*

Defendants argue that plaintiff's section 1983 claims should be dismissed for various reasons.  At the outset, defendants argue that plaintiff has failed to allege facts sufficient to establish that either Brooks or Gardner personally participated in any violation of plaintiff's constitutional rights.  Plaintiff argues that he has alleged sufficient facts and, if the Court should disagree, then the Court should grant plaintiff leave to amend the FAC to include the pre-termination and termination letters, both of which reflect Gardner's signature.

To state a claim under section 1983, a plaintiff must demonstrate that he was deprived of an existing federal constitutional or statutory right by a state actor or person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023), *cert. denied sub nom. Tulare v. Murguia*, 144 S. Ct. 553 (2024) (mem.) (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011)).  Generally, a state actor is not liable under section 1983 unless "there [is] a showing of personal participation in the alleged rights deprivation." *Murguia*, 61 F.4th at 1106 (collecting cases).  Put differently, the state actor must "play an affirmative part in the alleged deprivation of

constitutional rights." *Rise v. Oregon*, 59 F.3d 1556, 1563 (9th Cir. 1995) (internal quotation marks and citations omitted), *overruled on other grounds by City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). While there is generally no *respondeat superior* liability under section 1983, *Murguia*, 61 F.4th at 1106, a plaintiff may state a claim for supervisory liability by alleging either that the defendant supervisor was personally involved in the constitutional deprivation, or that a "sufficient causal connection" exists between the "supervisor's wrongful conduct and the constitutional violation," *Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

Plaintiff alleges that Brooks is OSP's Deputy Superintendent and Gardner is a Major with OSP. FAC ¶ 3. Plaintiff further alleges that Brooks and Gardner "were involved in the decision to terminate [p]laintiff." *Id.* Plaintiff finally alleges that Brooks and Gardner "were acting under color of state law, within the course and scope of their employment, and within their individual capacity when engaging in the acts and conduct hereinafter alleged." *Id.* The supplemental letters proffered by plaintiff are signed by Gardner but do not identify Brooks and are not signed by him.

Plaintiff has not alleged sufficient facts as to Brooks. Each of plaintiff's section 1983 claims are based on either plaintiff's termination or the denial of plaintiff's request to pursue arbitration of his termination using his FOP LDF attorney. Plaintiff alleges in a conclusory fashion that Brooks "w[as] involved in the decision to terminate [p]laintiff" but does not identify *how* Brooks was involved in that decision. *Id.* Plaintiff does not identify how Brooks was involved in the denial of plaintiff's request to pursue arbitration with FOP LDF representation, and in fact, his allegations implicate only non-parties Nees and Van Dyke in the denial. *See id.* ¶¶ 32, 34-35. Finally, though plaintiff states that he will "hereinafter allege[]" the acts and conduct in which Brooks engaged while acting under color of state law, plaintiff does not provide any further allegations regarding Brooks. As such, plaintiff's section 1983 claims all fail as alleged against Brooks.

As to Gardner, however, plaintiff's allegations are probably sufficient. Gardner clearly played some role in plaintiff's termination, as evidenced by his signature on plaintiff's pre-termination and termination letters. Because each of plaintiff's section 1983 claims is based, at least in part, on plaintiff's

termination, plaintiff's allegations are likely sufficient to survive dismissal as to Gardner on this basis. Nonetheless, for the reasons that follow, plaintiff ultimately fails to state a section 1983 claim.

                3.     *Constitutional Deprivation*

                    a.     Due Process

Count one of plaintiff's first claim for relief alleges violation of plaintiff's procedural and substantive due process rights. The Court addresses each due process theory in turn.

                        i.     *Procedural Due Process*

The government may not deprive an individual of a protected property or liberty interest without due process of law. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998) (citations omitted). "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Accordingly, the Court must first determine whether plaintiff has alleged the deprivation of a constitutionally protected property or liberty interest. Only then do the questions of what process was due and whether plaintiff received that process arise.

Plaintiff alleges that he had a protected property interest in his continued employment that was deprived when his employment was terminated. Defendants argue that plaintiff has failed to allege a protected property interest and that he received all the process he was due.

                          (1)     Deprivation of Protected Property or Liberty Interest

                              (a)     *Property Interest*

Plaintiff alleges that he "had a property interest in his job as a public employee" and "in his continued employment." Pl. Resp. to Defs. Mot. ("Pl. Resp."), ECF [18], at 8-10 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Plaintiff also asserts a right to pursue arbitration following his termination.

An employee "only has a constitutionally protected property interest in continued employment [] if he has a reasonable expectation or a 'legitimate claim of entitlement' to it, rather than a mere 'unilateral expectation.'" *Brady v. Gebbie*, 859 F.2d 1543, 1547-48 (9th Cir. 1988) (quoting *Bd. of*

*Regents of State Colls.*, 408 U.S. at 577), *abrogated by Act Up!/Portland v. Bagley*, 988 F.2d 868 (9th Cir. 1993).  State employees subject to at-will employment generally do not have a reasonable expectation of continued employment.  *Id.* (citing *Dorr v. County of Butte*, 795 F.2d 875, 876 (9th Cir. 1986)).  Oregon is an at-will employment state, meaning that "an employer may discharge an employee at any time, for any reason, unless doing so violates a contractual, statutory or constitutional requirement." *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1050 (9th Cir. 2012) (internal quotation marks omitted) (quoting *Yeager v. Providence Health Sys. Or.*, 195 Or. App. 134, 140, 96 P.3d 862 (2004)).  Thus, to allege a constitutionally protected property interest in continued employment, plaintiff must allege that his termination violated a contractual, statutory, or constitutional requirement.

Plaintiff identifies ORS § 236.360(4) and the governing CBA as the foundation of his purported property interest.  Under ORS § 236.360(4), "[d]isciplinary action may not be taken against a public safety officer without just cause."  A "public safety officer" is "[a] member of a law enforcement unit who is employed full-time as a peace officer[.]"  Or. Rev. Stat. § 236.350(3)(a); *Miller v. Watson*, No. 3:18-cv-00562-SB, 2019 WL 1871011, at *14 (D. Or. Feb. 12, 2019), *report and recommendation adopted*, 2019 WL 1867922 (D. Or. Apr. 25, 2019).  Plaintiff alleges that the governing CBA also provides that plaintiff could only be terminated for just cause.  "'Just cause' means a cause reasonably related to the public safety officer's ability to perform required work . . . [and] includes a willful violation of reasonable work rules, regulations or written policies."  Or. Rev. Stat. § 236.350(2).  Plaintiff finally alleges that he was terminated without just cause in violation of both ORS § 236.350(2) and the governing CBA.  Together, these allegations are sufficient to show that plaintiff had a reasonable expectation of, and therefore a constitutionally protected property right in, his continued employment.

Plaintiff's second purported property interest, that he had a right to pursue arbitration following his termination, is not clear.  As an initial matter, plaintiff does not identify any constitutional or statutory right to pursue a grievance or arbitration, let alone a constitutional or statutory right to be represented during that grievance or arbitration by a particular attorney.  Plaintiff appears to attempt to do so by pointing to two statutes: ORS § 236.360(2)(b), which plaintiff asserts "recognize[s]" "[t]he right to a

representative of an officer's choosing[,]" and ORS § 243.666(2), which plaintiff asserts "recognize[s]" "the right to pursue an individual's own grievance as an individual employee[.]" FAC ¶ 8; Pl. Resp. 2. These arguments fail.

First, ORS § 236.360(2)(b) provides that "when a public safety officer is under investigation concerning a matter that [] may lead to [] dismissal from employment and is subject to an interview by the officer's employer[,]" then the public safety officer is entitled to the following "safeguard": "[t]he public safety officer may have a representative of the officer's choosing present at the interview." Plaintiff ignores the critical facts that the statute, by its plain language, only entitles an officer to a representative of his choosing "at the *interview*[,]" and that plaintiff has conceded that his FOP LDF attorney was present at both of the pre-termination interviews that took place during the investigatory and disciplinary process. Or. Rev. Stat. § 236.360(2)(b) (emphasis added).

Second, ORS § 243.666 provides that even where a union "is the exclusive representative" under a CBA, the member employees "at any time may present grievances to their employer and have such grievances adjusted, without the intervention of the labor organization," so long as two requirements are met: the grievance adjustment must be consistent with the governing CBA and the union must have "been given opportunity to be present at the adjustment." Or. Rev. Stat. § 243.666(1)-(2). Further, the statute does not "prevent[] a public employer from recognizing a labor organization which represents at least a majority of employees as the exclusive representative of the employees of a public employer when the board has not designated the appropriate bargaining unit or when the board has not certified an exclusive representative in accordance with ORS 243.686[]." ORS § 243.666(3). The statute does not mention arbitration at all. As such, it cannot be said to establish an employee's entitlement to pursue arbitration, let alone an entitlement to pursue arbitration under circumstances where a governing CBA wrests that decision in the discretion of the member employees' exclusive representative.

Here, plaintiff did not attach the governing CBA as an exhibit to the FAC, and defendants did not provide the governing CBA such that the Court may incorporate it by reference. Defendants argue, and plaintiff appears to concede, that the CBA designates OSPOA as the "exclusive representative" of the

rights set forth therein.  Defs. Mot. 7-8; *see* FAC ¶ 59 (arguing that "forcing an individual to prosecute a grievance only through the exclusive labor association is a [constitutional and statutory] violation"); Pl. Resp. 14 (recognizing defendants' argument that a relevant ERB decision declared OSPOA as the exclusive representative under the governing CBA).  However, plaintiff argues that OSPOA waived its exclusive right to pursue arbitration when it permitted plaintiff to use his FOP LDF attorney during the pre-termination proceedings.  FAC ¶ 10 ("By accepting [p]laintiff's FOP LDF attorney as his representative, and by proceeding up to and through his termination without association, [d]efendant [*sic*[2]] has waived any argument [p]laintiff is not entitled to proceed on his own."); *see* Pl. Resp. 15 ("Plaintiff was allowed to utilize his own attorney for the entirety of his disciplinary process.").  In turn, defendants assert that plaintiff's waiver argument was persuasively discarded in ERB case *M.K. v. Oregon State Police*, UP-003-23 (Emp. Rels. Bd. July 25, 2023).  The Court need not reach these arguments.  Neither party has provided the Court with the governing CBA, and *M.K.*, as an administrative adjudication that was provided to the Court as an exhibit to a declaration of defendants' counsel, is not within the purview of the Court at the motion to dismiss stage.  Regardless, plaintiff's waiver arguments do not alter the fundamental analysis that plaintiff has failed to establish that he held a constitutionally or statutorily protected property interest in pursuing arbitration.

(b)    *Liberty Interest*

Plaintiff also alleges that he had "a liberty interest which employers can violate through conduct which imputes [an employee's] moral character, implies moral turpitude, or effectively blacklists the employee from their chosen profession."  Pl. Resp. 9 (citing *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007) ("*Engquist I*"), *aff'd*, 553 U.S. 591 (2008) ("*Engquist II*")).  Plaintiff argues that defendants violated this liberty interest as plaintiff's "law enforcement career has been effectively ended

---

[2] Though the FAC substitutes Brooks and Gardner for the State in several claims, it continues to refer to a singular "Defendant" throughout.  *See* FAC ¶¶ 46, 48-50, 54-56, 58, 61-64, 67-68.  Defendants argue that this indicates an attempt to circumvent Eleventh Amendment sovereign immunity by asserting a claim against the State under the guise of being a claim against Brooks and Gardner.  Should plaintiff choose to file a second amended complaint, the Court cautions him to be clear as to which defendant or defendants he is referring in each claim and underlying allegation.

and his certification has lapsed because he cannot get another police job." *Id.*

      "To state a due process liberty claim, [a plaintiff] must show that: (1) [the defendant] made a charge that might seriously damage [the plaintiff's] standing and associations in the community; (2) the accuracy of the charge is contested; (3) there is some public disclosure of the charge; and (4) the charge was made in connection with the termination of employment or the alteration of some right or status recognized by state law." *Miller*, 2019 WL 1871011, at *15 (citing *Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002)).  As these elements reflect, "[t]he mere fact of dismissal does not cause a deprivation of liberty[,]" *Clemente v. United States*, 766 F.2d 1358, 1365-66 (9th Cir. 1985), and "an 'interest in reputation standing alone is neither liberty nor property guaranteed against state deprivation without due process of law[,]'" *Miller*, 2019 WL 1871011, at *15 (quoting *Wenger*, 282 F.3d at 1074).  Rather, for constitutional liberty interests to be implicated, "the reasons for dismissal [must be] sufficiently serious to 'stigmatize' or otherwise burden the individual so that he is not able to take advantage of other employment opportunities." *Clemente*, 766 F.2d at 1366 (internal quotation marks and citation omitted).  The Ninth Circuit "has described the stigma that infringes liberty interests as that which '*seriously* damages a person's reputation or *significantly* forecloses his freedom to take advantage of other employment opportunities[,]'" and has "set the boundary of liberty interests at accusations of 'moral turpitude,' such as dishonesty or immorality[.]" *Loehr v. Ventura Cnty. Cmty. Coll. Dist.*, 743 F.2d 1310, 1317 (9th Cir. 1984) (emphasis in original) (citation omitted); *see Tibbets v. Kulongoski*, 567 F.3d 529, 535 (9th Cir. 2009) (alteration in original) (internal quotation marks omitted) (quoting *Brady*, 859 F.2d at 1552) ("[A] liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality.").

      Here, plaintiff alleges, and the pre-termination and termination letters show, that plaintiff's termination was based in part on a finding of dishonesty.  *See* FAC ¶ 22; Thenell Decl. Exs. 2-3.  Plaintiff also alleges, and the pre-termination and termination letters show, that his termination stemmed from an allegation that he "engage[d] in intimate conduct inside of a patrol car at a Fred Meyers [*sic*]" while on duty.  FAC ¶¶ 11, 18; Thenell Decl. Exs. 2-3.  Accepted as true, these allegations are sufficient to establish

that the basis of plaintiff's termination "impair[ed] [his] reputation for honesty or morality." *Tibbets*, 567 F.3d at 535. As such, plaintiff has sufficiently alleged the implication of a liberty interest. Nonetheless, as described below, plaintiff's procedural due process claim fails because plaintiff received due process.

(2)    Process Due and Received

Plaintiff argues that the denial of his request to pursue arbitration "deprived [p]laintiff of the opportunity to provide his dismissal was not for just cause," and that if he had been able to pursue arbitration, "he would have successfully overturned his discipline[,]" which would have had preclusive effect on this Court. Pl. Resp. 10-11 (citing *Gleason v. Gilmour*, No. 08-CV-552-BR, 2010 WL 5017930, at *3-4 (D. Or. Dec. 3, 2010)). Defendants argue that plaintiff received all the process he was due.

The doctrine of "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests[.]" *Mathews*, 424 U.S. at 332. Procedural due process requires notice and an opportunity to be heard. *See id.* at 333 (citations omitted); *Brewster*, 149 F.3d at 984-85 (citations omitted). Whether the opportunity to be heard must take place prior to or after the deprivation is "a function of [a] nebulous [] balanc[ing] [test]," and though a pre-deprivation opportunity to be heard is preferable, it is not always possible. *Brewster*, 149 F.3d at 985. For example, in "limited cases," a pre-deprivation opportunity to be heard may be foregone where "an important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may . . . justify postponing the opportunity to be heard until after the initial deprivation." *Id.* (internal quotation marks and alteration omitted) (quoting *FDIC v. Mallen*, 486 U.S. 230, 240 (1988)); *see Gilbert v. Homar*, 520 U.S. 924, 930-31 (1997) (collecting cases). Where a CBA provides for a grievance process, that process will "extinguish a plaintiff's due process claim only if the procedures meet or exceed constitutional standards." *Clukey v. Town of Camden*, 717 F.3d 52, 61-62 (1st Cir. 2013) (collecting cases).

Here, plaintiff's allegations establish that plaintiff was represented by both a union representative and his FOP LDF attorney throughout the investigation into his alleged misconduct, including during both pre-termination interviews and the pre-dismissal hearing. FAC ¶¶ 8, 10, 12, 20, 29. Only after the pre-dismissal hearing was plaintiff removed from service. *Id.* ¶¶ 4 (indicating that plaintiff

15

was terminated on or about October 31, 2022), 29 (indicating that the pre-dismissal hearing took place on or about August 2, 2022). Thus, plaintiff received an opportunity to be heard prior to his termination, as is preferable, and his termination cannot be said to have offended his procedural due process rights. *See Brewster*, 149 F.3d at 985.

*ii.    Substantive Due Process*

Defendants argue that plaintiff's substantive due process claim fails because plaintiff has not established or shown Gardner's personal participation in any alleged loss of profession. Defendants also argue that plaintiff's allegations are insufficient to meet the high bar required to establish a substantive due process claim premised on a loss of profession. Relying primarily on cases from the late 1800s, plaintiff argues that defendants "violated [his] substantive due process rights because [the] decision to terminate was not for just cause and therefore, was 'irrational or arbitrary.'" Pl. Resp. 11 (citations omitted). Plaintiff identifies his chosen profession as "law enforcement" and concedes that "there is no authority that holds he was previously entitled to [his] profession[,]" but argues that "once chosen, he [was] entitled to practice his profession free of arbitrary, unreasonable, or inequitable interference from the state or its agents." *Id.* at 12 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 367 (1886); *Barbier v. Connelly*, 113 U.S. 27, 31 (1884)).

In *Engquist I*, the Ninth Circuit considered for the first time "what showing is required in a substantive due process claim based on the right to pursue a particular profession." 478 F.3d at 996. The court first provided a backdrop regarding substantive due process, explaining that "[t]he substantive component of the Due Process Clause forbids the government from depriving a person of life, liberty, or property in such a way that . . . interferes with rights implicit in the concept of ordered liberty." *Id.* (internal citation and quotation marks omitted). The court then surveyed other courts' treatment of the issue and indicated that other courts have generally found that substantive due process does not protect a public employee's right to a particular position. *Id.* Finally, the court held that there is only a substantive due process claim for a public employer's violations of occupational liberty in "extreme cases, such as a 'government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license

16

of an individual in an occupation that requires licensure.'" *Id.* at 997-98 (quoting *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997)). The court rearticulated this standard by "hold[ing] that there is substantive due process protection against government employer actions that foreclose access to a particular profession to the same degree as government regulation." *Id.* at 998 (footnote omitted).

Applying its holding to the plaintiff's claims, the court began by analyzing the evidence set forth by the plaintiff at trial. In its analysis, the court specifically addressed the question of "how much interference with someone's job prospects constitutes a denial of the right to pursue a profession." *Id.* The court stated that "a plaintiff must show that the 'character and circumstances of a public employer's stigmatizing conduct or statements are such as to have destroyed an employee's freedom to take advantage of other employment opportunities.'" *Id.* (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 531 (7th Cir. 2000)). The court then made clear that "[i]t is not enough that the employer's stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the employee must show that the stigmatizing actions make it virtually impossible for the employee to find new employment in his chosen field." *Id.* (internal quotation marks omitted) (quoting *Bordelon*, 233 F.3d at 531).

The allegations relevant to plaintiff's substantive due process claim are found in paragraph forty-one of the FAC. In that paragraph, plaintiff alleges:

> "Because of [his] termination . . . [p]laintiff cannot work in law enforcement. Effectively his career is over. His police certification has lapsed according to the DPSST information system. Because [p]laintiff cannot work in law enforcement, he is unable to attend training to restore his certification. Further, according to the Statewide law enforcement economic system database, [p]laintiff's certification is under review for revocation due to his termination. Finally, he has been listed as a Brady officer by the Clackamas County District Attorney, based solely on the investigation and findings by [*sic*]"

FAC ¶ 41. In his response to defendants' motion, plaintiff likewise argues that "his law enforcement career has effectively ended[,] and his certification has lapsed because he cannot get another police job." Pl. Resp. 9. Plaintiff then argues that "[i]f a jury agrees with [p]laintiff that he was not dishonest, and that he was denied actual due process, then his claims have merit, especially at the 129(b)(6) [*sic*] stage." *Id.*

Plaintiff's allegations are insufficient to establish a substantive due process claim. Even when taken together and accepted as true, plaintiff's allegations are conclusory and unclear. He alleges that

he "cannot work in law enforcement" but does not allege specific facts to support this assertion.  For example, he alleges that his police certification has lapsed but does not explain why it lapsed, allege that it lapsed because of his termination, or allege that a lapse of certification bars all employment in law enforcement.  Similarly, and in an unfinished sentence, plaintiff alleges that "he has been listed as a Brady officer by the Clackamas County District Attorney" but does not identify what a "Brady officer" is, why he was listed as one, what impact being a "Brady officer" has on plaintiff's ability to obtain employment in law enforcement, or how Gardner was involved in plaintiff being listed as one.  Because plaintiff's allegations cannot be said to establish that Gardner took "stigmatizing actions" that "make it virtually impossible for [plaintiff] to find new employment in [law enforcement][,]" dismissal of this claim is appropriate.  *Engquist I*, 478 F.3d at 998 (internal quotation marks and citation omitted).

b.      Equal Protection

Count two of plaintiff's first claim for relief alleges violation of plaintiff's right to equal protection.  Plaintiff argues that his termination occurred under the pretext of "dishonesty" and that plaintiff has a disability that encompasses memory issues, and his termination thus violated the equal protection clause.  FAC ¶¶ 54-55.  Defendants argue that plaintiff has failed to establish Gardner's personal participation or allege a constitutional injury.

"The Equal Protection Clause ensures that all persons similarly situated should be treated alike."  *Engquist I*, 478 F.3d at 992 (internal quotation marks and citation omitted).  This guarantee "is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity."  *Harris v. McRae*, 448 U.S. 297, 322 (1980) (citations and footnote omitted).  A plaintiff asserting an equal protection claim must show either that "the defendants acted with an intent or purpose to discriminate against the plaintiff based on membership in a protected class[,]" or that he was treated as a "class of one," differently from others similarly situated.  *Shooter v. Arizona*, 4 F.4th 955, 960 (9th Cir. 2021) (citation omitted).

In *Engquist I*, the Ninth Circuit conclusively held "that the class-of-one theory of equal protection is not applicable to decisions made by public employers."  478 F.3d at 992.  This holding was

18

affirmed by the Supreme Court on appeal in *Engquist II*. 553 U.S. at 594. Regarding its holding, the Ninth Circuit reasoned that "applying the class-of-one theory to public employment would [] generate a flood of new cases, requiring the federal courts to decide whether any public employee was fired for an arbitrary reason or a rational one." *Engquist I*, 478 F.3d at 995 (citing *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004)). It further reasoned that "[t]he theory would apply not only to discharges, but also to other employment actions, such as promotions, disciplinary actions, and decisions about pay, benefits and transfers. . . . [F]ederal courts would be required to 'review the multitude of personnel decisions that are made daily by public agencies.'" *Id.* (quoting *Bishop v. Wood*, 426 U.S. 341, 349-50 (1976)). It is a "common-sense realization that government offices could not function if every employment decision became a constitutional matter[.]" *Engquist II*, 553 U.S. at 599 (quoting *Connick v. Myers*, 461 U.S. 138, 150-51 (1983)).

Because OSP is a public employer, plaintiff cannot avail himself of a class-of-one theory. Thus, plaintiff must show that defendants "acted with an intent or purpose to discriminate against [] plaintiff based on membership in a protected class." *Shooter*, 4 F.4th at 960. Here, plaintiff's allegations only plausibly support that plaintiff has a mental disability: PTSD. The Supreme Court has made clear that disability—both physical and mental—is a "nonsuspect status[]" that implicates rational basis review. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41, 446 (1985); *see Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Thus, the question is whether the facts alleged show that defendants' decision to terminate plaintiff's employment was "rationally related to a legitimate government purpose," *City of Cleburne*, 473 U.S. at 446, or rather, whether the facts may prove that defendants' decision was made "with an intent or purpose to discriminate against [plaintiff] based on [his] [disability][,]" *Shooter*, 4 F.4th at 960.

To show that defendants acted with discriminatory intent based on plaintiff's membership in a protected class, plaintiff must offer more than "[c]onclusory allegations of discrimination"; instead, he must set forth "facts [that] may prove invidious discriminatory intent." *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1108-09 (S.D. Cal. 2004) (citing *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977)), *abrogated on other grounds*, 318 F. App'x 540 (9th Cir. 2009); *see Mora-*

*Contreras v. Peters*, No. 6:18-cv-00678-SB, 2020 WL 2089479, at *5-6 (D. Or. Apr. 30, 2020) (quoting *Cabrera v. Maddock*, No. 10-611, 2012 WL 3778827, at *5 (E.D. Cal. Aug. 30, 2012)) ("[The] [p]laintiff's personal belief that the [event] was motivated by race by itself is not sufficient to state a claim. . . . [T]o state an equal protection claim, an amended complaint . . . should provide enough circumstantial detail, such as statements or specific conduct, to support his conclusion that race was a motivating factor in the [event] rather than a coincidence.'"), *aff'd*, 851 F. App'x 73 (9th Cir. 2021); *180 Land Co. LLC v. City of Las Vegas*, 833 F. App'x 48, 50-51 (9th Cir. 2020) (citations omitted) (dismissing equal protection claim "because [the] plaintiffs alleged contradictory facts as to [the] defendants' motivation that were insufficient to show that intentional discrimination was a motivating factor for [the] defendants' actions"); *Clark v. Milwaukie Police Dep't*, No. 3:22-cv-00662-SB, 2022 WL 4473487, at *4 (D. Or. Sept. 15, 2022).

When examining the intent question, courts may consider factors such as whether there are "gross statistical disparities" that tend to show that some invidious or discriminatory purpose underlies the government action; "the historical background of the decision"; "the sequence of events leading up to the decision"; "and any relevant legislative or administrative history." *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) (citing *Vill. of Arlington Heights*, 429 U.S. at 264-68). "If there is no evidence of intentional discrimination, then the court assumes that the challenged actions were not based on discrimination and must inquire only whether the actions were rationally related to a legitimate governmental interest." *Id.* (citing *Hispanic Taco Vendors of Wash. v. City of Pasco*, 994 F.2d 676, 680 (9th Cir. 1993)).

The standard for finding a rational basis belying a governmental action is a deferential one; courts will uphold government action "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *HSH, Inc. v. City of El Cajon*, 44 F. Supp. 3d 996, 1007 (S.D. Cal. 2014) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)); *see Valhalla Custom Homes, LLC v. City of Portland*, No. 3:21-cv-00225-JR, 2021 WL 8156024, at *5 (D. Or. Sept. 17, 2021), *report and recommendation adopted*, 2022 WL 796012 (D. Or. Mar. 16, 2022) ("Rational basis review is a 'highly deferential' standard."). Governmental action is "irrational" if it is arbitrary, capricious, or malicious. *See*

*Engquist I*, 478 F.3d at 993 ("[A]cts that are malicious, irrational, or plainly arbitrary do not have a rational basis."); *Valhalla Custom Homes, LLC*, 2021 WL 8156024, at *5 (alteration in original) (citations omitted) ("Where rational basis applies, 'the Court determines whether government action is so arbitrary that a rational basis for the action cannot even be conceived post hoc.' . . . Even '[o]fficial decisions that rest on an erroneous legal interpretation are not necessarily constitutionally arbitrary.'"); *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013) (internal quotation marks and citation omitted) ("Governmental action is rationally related to a legitimate goal unless the action is clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals, or general welfare."). "Selective enforcement of valid laws, without more, does not make the defendants' action irrational." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1188 (9th Cir. 1995) (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *United States v. Kidder*, 869 F.2d 1328, 1335 (9th Cir. 1989)).

Rational basis review may be undertaken on a motion to dismiss. *HSH, Inc.*, 44 F. Supp. 3d at 1008 (citing *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1208-11 (9th Cir. 2005)). Doing so, however, "poses unique challenges." *Id.* (internal quotation marks and citation omitted). Courts faced with this posture "should 'take as true all of the complaint's allegations and reasonable inferences that follow,' but the 'plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.'" *Id.* (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)). Courts are permitted to "go beyond the pleadings to hypothesize a legitimate governmental purpose," but nonetheless, any rational relationship that is hypothesized "must be real." *Id.* (quoting *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 936-37 (5th Cir. 1988)). Ultimately, "[t]he appropriateness of looking beyond the pleadings to perform a rational relationship analysis depends on (1) the specific facts pleaded by the plaintiff[,] (2) the state of knowledge of the court making the analysis[,] and (3) the complexity of the official action which is being challenged." *Id.* (quoting *Mahone*, 836 F.2d at 937). Finally, "[t]he rational basis review test is functionally the same under substantive due process and the Equal Protection Clause[,]" *Graham v. Brown*, 570 F. Supp. 3d 968, 980 (D. Or. 2021) (citing *Gamble v. City of Escondido*, 104 F.3d 300, 307 (9th Cir. 1997)), and the Court may thus rely on case law describing

rational basis review in the context of either doctrine.

Plaintiff's equal protection claim fails for several reasons. Plaintiff argues that his termination occurred under the pretext of "dishonesty" but that it was in fact motivated by plaintiff's disability, PTSD, which encompasses memory issues. FAC ¶¶ 54-55. First, this appears to be a class-of-one argument, *see Engquist I*, 478 F.3d at 993 ("[I]n an equal protection claim based on selective enforcement of the law, a plaintiff can show that a defendant's alleged rational basis for his acts is a pretext for an impermissible motive."), of which plaintiff cannot avail himself as a public employee. Furthermore, while it is true that "a plaintiff may pursue an equal protection claim by raising a 'triable issue of fact as to whether the defendants' asserted [rational basis] . . . was merely a pretext' for differential treatment[,]" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 945-46 (9th Cir. 2004), *overruled on other grounds by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005), plaintiff has not alleged facts that allow this Court to reasonably make the inference that plaintiff's termination was pretextual.

Second, plaintiff has not alleged "facts [that] may prove invidious discriminatory intent." *Harper*, 345 F. Supp. 2d at 1108-09 (citing *Vill. of Arlington Heights*, 429 U.S. at 265). To the extent plaintiff argues that he sufficiently alleges discriminatory intent by alleging that the termination decision was made pretextually, this argument fails because "[s]elective enforcement of valid laws, without more, does not make the defendants' action irrational." *Freeman*, 68 F.3d at 1188. Plaintiff appears to attempt to allege discriminatory intent by alleging that Major A.H. was treated differently than him, but again, this amounts to a class-of-one argument and fails for several other reasons, including because Major A.H. is not alleged to be similarly situated, such as by also having PTSD or some other disability.

Third, plaintiff has not "allege[d] facts sufficient to overcome the presumption of rationality that applies to government classifications." *HSH, Inc.*, 44 F. Supp. 3d at 1008 (internal quotation marks omitted) (quoting *Wroblewski*, 965 F.2d at 460). The bar is a high one, and plaintiff does not plead facts to support any inference that defendants' termination decision was arbitrary, capricious, or malicious. To the contrary, the materials that plaintiff submitted show that defendants "took the potential for memory loss into consideration, but found independent evidence, including plaintiff's own texts, to support [OSP's]

22

conclusion [that plaintiff engaged in] inappropriate behavior while on duty that would merit discipline." Defs. Reply 6. Plaintiff's own "factual allegations indicate that [disability] may not have been a motivating factor[,]" and, importantly, "[p]laintiff's personal belief that [his termination] was motivated by [disability] by itself is not sufficient to state a claim[.]" *Mora-Contreras*, 2020 WL 2089479, at *5-6 (internal quotation marks and citation omitted). The FAC simply does not "provide enough circumstantial detail, such as statements or specific conduct, to support [plaintiff's] conclusion that [disability] was a motivating factor in [his termination] rather than a coincidence." *Id.* (internal quotation marks and citation omitted).

In sum, plaintiff's allegations are insufficient to establish an equal protection claim.

c.      Freedom of Association and Retaliation

Plaintiff's second claim alleges violation of his First Amendment rights to freedom of association and to be free from retaliation for exercising his right to freedom of association. Plaintiff argues (1) that defendants violated his right to freedom of association by not allowing him to choose the FOP LDF to defend his employment termination, and (2) that defendants and the OSPOA retaliated against him for trying to use his FOP LDF attorney by terminating him. FAC ¶¶ 57-58. Defendants argue that plaintiff has failed to establish Gardner's personal participation or allege a constitutional injury.

As an initial matter, plaintiff has not alleged any facts that, accepted as true, would allow the Court to conclude that Gardner personally participated in the denial of plaintiff's request defend his termination with FOP LDF representation. To the contrary, plaintiff alleges that the denial of his request to defend his termination with FOP LDF representation was made by the OSPOA and then communicated to him by Crammond and Nees. *See* FAC ¶¶ 32, 34. Plaintiff's claim thus fails under that theory, and the Court need not address the parties' remaining freedom of association arguments.

Plaintiff's claim also fails under his retaliation theory. The protections of the First Amendment "include not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Stephens v. Douglas Cnty. Fire Dist. No. 2*, 205 F. Supp. 3d 1233, 1237 (E.D. Wash. 2016) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968)). "To establish a prima facie case for a typical First Amendment retaliation claim, a public employee must show that 1) he

23

engaged in protected speech; 2) the defendants took an adverse employment action against him; and 3) his speech was a substantial or motivating factor for the adverse employment action." *Biggs v. Town of Gilbert*, No. CV11-330-PHX-JAT, 2012 WL 94566, at *4 (D. Ariz. Jan. 12, 2012) (citing *Hudson v. Craven*, 403 F.3d 691, 695 (9th Cir. 2005)); *Stephens*, 205 F. Supp. 3d at 1237-38.

Regarding the first element, the speech at issue is only protected if it "addresses a matter of legitimate public concern." *Biggs*, 2012 WL 94566, at *4 (internal quotation marks omitted) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)). This "legitimate public concern" requirement applies with equal force to claims premised on a right to associate with counsel. *Id.* at *6 (reasoning that Ninth Circuit precedent "indicate[s] that the Ninth Circuit would hold that the public-concern requirement applies to a claim for the right to associate with counsel"); *Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073 (10th Cir. 2011) (applying public concern requirement to the plaintiff's claim that the defendants terminated him because they disapproved of the fact that he retained an attorney to represent him in a disciplinary matter). Where an attorney's representation of a plaintiff is "not to pursue matters of public concern[,]" *i.e.*, where the "representation d[oes] not go beyond the realm of an everyday employment dispute[,]" the legitimate public concern requirement is not satisfied. *Biggs*, 2012 WL 94566, at *7; *see Stephens*, 205 F. Supp. 3d at 1238-39 ("Speech is not a matter of public concern if it involves personnel disputes and grievances that have no relevance to the public's evaluation of the government or agency.").

Regarding the third element, "[a] plaintiff alleging an adverse employment action in violation of his First Amendment rights must show that his protected conduct was a 'substantial' or 'motivating' factor for the employer's action." *Strahan v. Kirkland*, 287 F.3d 821, 825 (9th Cir. 2002) (citation omitted). Once alleged, the burden then shifts to the employer who must "demonstrate either that, under the balancing test established by *Pickering*[,] the employer's legitimate administrative interests outweigh the employee's First Amendment rights or that, under the mixed motive analysis established by *Mt. Healthy*[,] the employer would have reached the same decision even in the absence of the employee's protected conduct." *Hudson v. Craven*, 403 F.3d 691, 695 (9th Cir. 2005) (internal quotation marks and

citation omitted).

Plaintiff's allegations are insufficient to establish the elements of his retaliation claim. Plaintiff cannot satisfy the first element, the legitimate public concern requirement, because the representation he sought and was denied was "not to pursue matters of public concern" as it "did not go beyond the realm of an everyday employment dispute[,]" *Biggs*, 2012 WL 94566, at *7, and because his claim "involves a personnel dispute[] and grievance[] that ha[s] no relevance to the public's evaluation of the [State][,]" *Stephens*, 205 F. Supp 3d at 1238-39; *see Shockey v. City of Portland*, 313 Or. 414, 427-28, 837 P.2d 505 (1992) (en banc) (internal quotation marks omitted) (quoting *Connick v. Myers*, 461 U.S. 138 (1983)) (noting that the Court in *Connick* deemed the majority of the plaintiff's speech to not be of public concern because the matters concerned internal office issues and the plaintiff did not seek to "inform the public[,]" "bring to light actual or potential wrongdoing or breach of public trust[,]" or "convey [any] information at all other than the fact that a single employee [was] upset with the status quo. . . . To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case[.]").[3] Though *Biggs* and *Stephens* are not binding on this Court, the reasoning set forth in those cases is persuasive, particularly considering the general lack of Ninth Circuit authority addressing First Amendment freedom of association retaliation claims in the public employment context.

---

[3] Plaintiff cites *Janus v. AFSCME*, 585 U.S. 878 (2018), multiple times, namely for the proposition that plaintiff's request to use his FOP LDF attorney would not offend the sense of "labor peace" that may serve as a compelling state interest in cases involving employers and unions. FAC ¶ 59; *see* Pl. Resp. 14-15. However, *Janus* is inapposite and concerns a materially distinct set of material facts and legal issue. 585 U.S. at 916, 929-30 (holding that public employees cannot be compelled to be union members, in part because such a requirement constitutes compelled association and speech in violation of the First Amendment"). Here, plaintiff does not set forth a compelled speech argument and is a voluntary member of his union; thus, there is no compelled speech issue, and *Janus* does not aid plaintiff's argument.

Furthermore, it appears that *Janus* in fact may cut against plaintiff's position as to the important public concern requirement. Discussing that requirement, the Supreme Court noted in *Janus* that "[w]hen a large number of employees speak through their union, the category of speech that is of public concern is greatly enlarged, and the category of speech that is only private concern is substantially shrunk." *Id.* at 907-08. To the extent that plaintiff concedes that the CBA designates the OSPOA as the exclusive representative of the member employees' rights under the CBA, *see* FAC ¶ 59 (arguing that "forcing an individual to prosecute a grievance only through the exclusive labor association is a [constitutional and statutory] violation"); Pl. Resp. 14 (recognizing defendants' argument that a relevant ERB decision declared OSPOA as the exclusive representative under the governing CBA), *Janus* in fact suggests that plaintiff's termination does not involve an important public concern.

Though the Court need not address the remaining elements, it is worth noting that both plaintiff's own allegations and the pre-termination and termination letters he proffers further suggest that the State had legitimate administrative interests underlying his termination, and that under the mixed motive analysis, the State likely "would have reached the same decision even in the absence of the employee's protected conduct." *Stephens*, 205 F. Supp. 3d at 1241; *see* FAC ¶ 18 (disclaiming that "sex on duty" occurred but acknowledging existence of Facebook messages between plaintiff and S.D. "in which they playfully discuss kissing and making out in [p]laintiff's [patrol] car); Thenell Decl Exs. 2-3 (discussing Facebook messages).

In sum, plaintiff's allegations are insufficient to establish either a freedom of association or retaliation claim under the First Amendment.

## C.    Wrongful Discharge

Defendants move to dismiss plaintiff's claim for common law discharge on two independent grounds: plaintiff's existing remedies are adequate, and plaintiff has not alleged facts sufficient to meet the "important public duty" requirement. Defs. Mot. 19. Plaintiff's existing remedies are likely inadequate. However, plaintiff's claim wrongful discharge claim nonetheless fails because plaintiff cannot satisfy the "important public duty" requirement.

### 1.    *Adequacy of Statutory Remedies*

"[W]rongful discharge is an interstitial tort, designed to fill a gap where a discharge in violation of public policy would otherwise not be adequately remedied." *Dunwoody v. Handskill Corp.*, 185 Or. App. 605, 613, 60 P.3d 1135 (2003)). As such, "if an adequate statutory remedy exists, a common law wrongful discharge claim based on the same conduct is precluded." *Lovell v. Sky Chefs Inc.*, No. 3:15-cv-00327-SI, 2015 WL 4488026, at *3 (D. Or. July 22, 2015) (quoting *Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1130-31 (D. Or. 1998) ("[G]iven that [the tort of wrongful discharge] was created to establish only a narrow exception to the employment-at-will doctrine, this court concludes that a claim for common law wrongful discharge is not available in Oregon if (1) an existing remedy adequately protects the public interest in question, or (2) the legislature has intentionally abrogated the common law remedies

by establishing an exclusive remedy (regardless of whether the courts perceive that remedy to be adequate)."); *see Carlson v. Crater Lake Lumber Co.*, 103 Or. App. 190, 193, 796 P.2d 1216 (1990), *op. adh'd to as modified on recons.*, 105 Or. App. 314, 804 P.2d 511 (1991) (noting that Oregon courts will not "recognize an additional common law remedy of wrongful discharge" if "existing remedies adequately protect the employment related right").

Where a statutory remedy is adequate, it is exclusive. *Farrimond v. La.-Pac. Corp.*, 103 Or. App. 563, 567, 798 P.2d 697 (1990). A statutory remedy is "adequate" if it will "fully vindicate the public interest[,]" *Dunwoody*, 185 Or. App. at 613-14, or where the remedies provided by a wrongful discharge claim would be "essentially duplicative" of the statutory remedy, *Draper*, 995 F. Supp. at 1132. The adequacy question has been the subject of "considerable confusion" amongst Oregon courts. *Draper*, 995 F. Supp. at 1128; *see Osborn v. Or. Wellness LLC*, No. 04-1187-JE, 2005 WL 8177154, at *8 (D. Or. Oct. 14, 2005) (citation omitted) ("Whether a common law wrongful discharge claim is available in particular circumstances has, in recent years, been one of the most vexing issues of Oregon law."), *report and recommendation adopted*, 2005 WL 8177162 (D. Or. Nov. 21, 2005).

"[T]he existence of a contractual relationship, by itself, does not foreclose an employee from bringing a claim for common-law wrongful discharge"; however, the ultimate question is "whether the remedies provided by contract adequately redress the alleged injury." *Dunwoody*, 185 Or. App. at 614 (finding existing remedies to be inadequate "[g]iven the limited nature of [the employment] contract and the substantial divergence between what [the plaintiff] is entitled to recover under the two different theories"). *Compare Carlson*, 103 Or. App. at 195 (citing Or. Rev. Stat. § 652.355) (deeming adequate a "statutory remedy that protects the rights of employees to make good faith wage claims" where wrongful discharge claim was based on allegations that the plaintiff was "constructively discharged in retaliation for asserting a wage claim"), *and Walsh v. Consol. Freightways, Inc.*, 278 Or. 347, 352, 563 P.2d 1205 (1977) (citing 29 U.S.C. § 660(c)) (deeming adequate a statutory remedy that allowed "an employee who feels he has been discharged for reporting a safety or health violation [to] file a complaint with the Department of Labor" where wrongful discharge was based on allegations that the plaintiff was "discharged for reporting

a safety or health violation"), *with Carlson*, 103 Or. App. at 196 (citing *Holien v. Sears, Roebuck & Co.*, 298 Or. 76, 689 P.2d 1292 (1984) (en banc)) (noting that wrongful discharge claim should proceed when additional remedy is "necessary to redress fully the *personal nature* of [the] injury[,]" such as when an employee "has been sexually harassed and then discharged for resisting that harassment"), *and Dunwoody*, 185 Or. App. at 613-14 (emphasis in original) (citing *Shockey*, 313 Or. at 414) (allowing wrongful discharge claim to proceed, despite the fact that the plaintiff was covered by CBA that protected him from discharge absent "just cause" and by Public Employees Collective Bargaining Act, because "[t]here has been no demonstration of *either* the legislature's intent to identify and provide an adequate remedy for all the harm suffered by plaintiff *or* of a legislative intent to supersede this common law remedy").

    Here, like the plaintiff in *Dunwoody*, plaintiff alleges that he could only be terminated for just cause. *See* FAC ¶ 9; *Dunwoody*, 185 Or. App. at 614 (citing *Swanson v. Van Duyn Choc. Shops*, 282 Or. 491, 493, 579 P.2d 239 (1978)). It is not clear what damages are recoverable under the applicable CBA, as neither party has provided the CBA to the Court. However, a breach of contract claim would presumably allow plaintiff to recover "wages accrued at the time of trial [and] the present value of any lost wages for the remainder of the employment contract[,] offset by any amount earned in other employment or any amount that could have been earned in other employment by the exercise of reasonable effort." *Dunwoody*, 185 Or. App. at 614-15 (citing *Bramhall v. ICN Med. Lab'ys, Inc.*, 284 Or. 279, 286-87, 587 P.2d 1113 (1978)). Section 1983 claims brought under the First and Fourteenth Amendments provide for injunctive relief and for recovery of economic and non-economic damages and attorney's fees. *See Reilly v. City of Aurora*, No. 6:11-cv-06235-SI, 2012 WL 5498163, at *2 (D. Or. Nov. 13, 2012). The remedies available "under the FMLA are limited to lost compensation or other actual monetary losses, an equal amount in liquidated damages, and appropriate equitable relief." *Wilson v. Tarr, Inc.*, No. CV-99-1412-HU, 2000 WL 1292590, at *6 (D. Or. Sept. 8, 2000) (rejecting argument that wrongful discharge claim was foreclosed by existing remedies "[b]ecause the remedies for a FMLA . . . are less comprehensive than those available for a Title VII claim"); *see Oelke v. Costco Wholesale Corp.*, No. 04-6439-AA, 2005 WL 1173311, at *2 (D. Or. Apr. 26, 2005).

Remedies available to a plaintiff in a tort action for wrongful discharge include "the full range of economic damages, as well as damages 'for such personal injuries as anguish, physical symptoms of stress, a sense of degradation, and the cost of psychiatric care.'" *Dunwoody*, 185 Or. App. at 615 (quoting *Holien*, 298 Or. at 97). Courts in this district have previously faced the question of when section 1983 provides an adequate remedy such that a wrongful discharge claim will not stand. *See Allen v. Or. Health & Scis. Univ.*, No. 06-CV-285-BR, 2006 WL 2252577, at *3 (D. Or. Aug. 4, 2006). "[T]he question is not whether the existing remedy [under section 1983] is 'the best possible remedy' or 'identical to the tort remedy' but merely whether it is sufficient to 'adequately protect the employment related right.'" *Id.* (quoting *Draper*, 995 F. Supp. at 1134). For example, a plaintiff is entitled to pursue a wrongful discharge claim "when a [section] 1983 remedy is not available as a matter of law," such as when the section 1983 claim is alleged against a private employer or when a defendant would be entitled to qualified immunity. *Id.* (citing *Draper*, 995 F. Supp. at 1130-31; *Dier v. City of Hillsboro*, No. CV02-24-BR, 2004 WL 1243845, at *11 (D. Or. Mar. 18, 2004)) (noting that "there can be substantial differences between the elements a plaintiff must prove to establish a public employer's liability under [section] 1983 and the elements a plaintiff must show to prove a wrongful-discharge claim against the same employer arising from the same facts" and that "[i]n certain circumstances, these differences can mean a [section] 1983 remedy is not available as a matter of law").

In *Draper*, the court dismissed the plaintiff's wrongful discharge claim based on the adequacy of a section 1983 remedy where the elements needed to prove the wrongful discharge and section 1983 claims were "substantially similar"; section 1983 in fact provided the plaintiff with "more generous" remedies than those provided for in a wrongful discharge claim, including the allowance of punitive damages against individual defendants; the plaintiff filed suit against a public employer; the defendants acted under color of state law; and it appeared that the defendants would not be entitled to qualified immunity. 995 F. Supp. at 1131-32. Courts have also dismissed wrongful discharge claims based on the adequacy of a section 1983 remedy where both the wrongful discharge and section 1983 claim required the plaintiff "to satisfy essentially the same 'public importance' standard[,]" *Reilly v. City of Aurora*, No. 6:11-

cv-06235-SI, 2012 WL 5498163, at *3 (D. Or. Nov. 13, 2012); *see Draper*, 995 F. Supp. at 1131, and where an employee suffered an injury in the form of retaliation for engaging in protected activity covered by Title VII and Chapter 652 of the ORS, *Whitley v. City of Portland*, 654 F. Supp. 2d 1194, 1124 (D. Or. 2009) (citation omitted). In contrast, courts have declined to dismiss wrongful discharge claims based on the adequacy of a section 1983 remedy where the proof required to prevail on the plaintiff's wrongful discharge claim was "substantially different" than the proof required to prevail on the section 1983 claim, *Allen*, 2006 WL 2252577, at *4, and where the plaintiff has brought the section 1983 and wrongful discharge claims against different defendants, *Huff v. City of Portland*, No. Civ. 05-1831-AA, 2006 WL 572152, at *2 (D. Or. Mar. 6, 2006).

Here, plaintiff appears to allege that his statutory remedies were not adequate because he was not given the opportunity for a name-clearing hearing or a fair investigation. *See* FAC ¶¶ 73, 97. This contention fails for several reasons. First, a name-clearing hearing is an available remedy for a section 1983 claim brought under the Fourteenth Amendment. *See Bd. of Regents of State Colls.*, 408 U.S. at 573. Second, plaintiff does not allege that he sought and was denied a name-clearing hearing. Despite these misguided arguments, dismissal is not appropriate based on the adequacy of plaintiff's existing statutory remedies.

While there is much overlap between the remedies available under a wrongful discharge and section 1983 claim, plaintiff's access to those remedies under the facts alleged differs substantially. First, the doctrine of *respondeat superior* applies to the tort of wrongful discharge but not a section 1983 claim. Plaintiff's section 1983 claims all fail as alleged against Brooks due to insufficient allegations as to Brooks' personal participation; thus, it is theoretically possible that plaintiff could state a claim against Brooks for wrongful discharge, though he cannot under section 1983. Second, because the doctrine of *respondeat superior* applies to the tort of wrongful discharge, "an employer can be liable for wrongful discharge based on an employee's unlawful acts within the scope of his employment." *Allen*, 2006 WL 2252577, at *3. For this reason, though plaintiff may not recover on a section 1983 claim against the State, plaintiff could nonetheless assert a wrongful discharge claim against the State under a theory of vicarious

liability. *See id.* at *4 ("[A] plaintiff who is not able to establish any basis of direct liability against a public employer never will have any available remedy under [section] 1983 even if the same plaintiff is able to prove the employer is vicariously liable for conduct alleged to have caused a wrongful discharge under Oregon law.").  Third, the burden of proof a plaintiff faces when asserting a direct liability section 1983 claim is different than the burden a plaintiff faces when asserting a wrongful discharge claim.  Fourth, a wrongful discharge claim provides for recovery of emotional distress and punitive damages, whereas a section 1983 claim does not.

For these reasons, plaintiff's wrongful discharge claim should not be dismissed on the grounds that plaintiff has adequate existing remedies.  Nonetheless, because plaintiff cannot satisfy the important public duty requirement, plaintiff's wrongful discharge claim fails.

    2.    *Important Public Duty Exception*

As noted above, an employee may only bring a wrongful discharge claim if they were discharged for (1) exercising a job-related right that reflects an important public policy, or (2) fulfilling a public duty or societal obligation.  *Babick v. Or. Arena Corp.*, 333 Or. 401, 407, 40 P.3d 1059 (2002). Under either prong, the plaintiff "must establish a 'causal connection' between a protected activity and the discharge."  *Sheppard*, 694 F.3d at 1051 (internal quotation marks and citations omitted).  "A 'causal connection' requires a showing that 'the employee's protected activity [was] a substantial factor in the motivation to discharge the employee."  *Id.* (alteration in original) (internal quotation marks and citations omitted).  "[T]o be a substantial factor, the employer's wrongful purpose must have been a factor that made a difference in the discharge decision."  *Id.* (alteration in original) (internal quotation marks and citations omitted).

Regarding the first prong, "[e]xamples of 'exercising a job-related right that reflects an important public policy' include an employee filing for workers compensation or an employee taking leave under the Oregon Family Leave Act."  *Sheppard*, 694 F.3d at 1050-51 (citing *Brown v. Transcon Lines*, 284 Or. 597, 603-04, 588 P.2d 1087 (1978); *Yeager*, 195 Or. App. at 134).  Regarding the second prong, the public duty exception requires that a plaintiff identify a "duty to perform a specific act."  *Babick*, 333

Or. at 409.  In identifying such a duty, courts "cannot simply create a relevant public duty to suit the occasion, but must actually 'find' one in the state's constitutional and statutory provisions and case law." *Lamson v. Crater Lake Motors, Inc.*, 346 Or. 628, 637, 216 P.3d 852 (2009) (en banc) (citing *Babick*, 333 Or. at 401).  Such a duty may be found when a statute, case, rule, or constitutional provision "specifically encourage[s] or require[s] a particular action" or when such sources "otherwise demonstrat[e] that such act[ion] enjoy[s] high social value."  *Love v. Polk Cnty. Fire Dist.*, 209 Or. App. 474, 486, 149 P.3d 199 (2006) (third, fourth, and fifth alterations in original) (quoting *Eusterman v. Nw. Permanente, P.C.*, 204 Or. App. 224, 230, 129 P.3d 213 (2006)).

Actions with "high social value" are narrowly defined.  *Id.* at 486-87.  Such conduct must, at the very least, be "by statute or rule, [] explicitly described as being of high social value[,]" and be "similar to [conduct] giving rise to legally compelled obligations to act in other, analogous contexts."  *Id.* at 487.  Statutes articulating a general public policy that could be "thwarted by the discharge at issue," standing alone, are usually insufficient to support a wrongful discharge claim.  *Lamson*, 346 Or. at 637-38.  That is, the relevant public policy must "speak directly to [the] acts" allegedly underlying the wrongful discharge.  *Id.*  Thus, Oregon courts have found that a public duty or societal obligation exists for serving on a jury, *Nees v. Hocks*, 272 Or. 210, 219, 536 P.2d 512 (1975) (en banc), for refusing to sign false and potentially defamatory statements about a co-worker, *Delaney v. Taco Time Int'l, Inc.*, 297 Or. 10, 17, 681 P.2d 114 (1984) (en banc), and for reporting patient abuse at a nursing home, *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107, 110, 684 P.2d 21 (1984).  Where there is "no support in the statutes" for "the kind of acts that allegedly triggered [a plaintiff's] discharge[,]" then that plaintiff has failed to state a claim to relief.  *See Babick*, 333 Or. at 410.  Oregon courts have also recognized that "an employee's 'whistleblowing' about activities in the workplace sometimes serves a sufficiently important public interest that discharging the employee for such conduct would be wrongful."  *Lamson*, 346 Or. at 634.

Plaintiff has not set forth allegations to implicate the first prong, and instead centers his allegations and arguments on the second.  Plaintiff (1) alleges that the important public duty at issue is

plaintiff's act of defending himself in the disciplinary process, FAC ¶ 70, and (2) argues that "[t]here exists an important public duty to have a grievance adjusted by an individual employee, so much so, that the legislature enacted ORS 243.666" which "states that an employee can present grievances to their employer and have such grievances adjusted, without the intervention of the labor organization if the adjustment is not inconsistent with the terms of a collective agreement contract or agreement then in effect; and the labor organization has been given an opportunity to be present at the adjustment[,]" Pl. Resp. 16.  Plaintiff's arguments fail.

Plaintiff identifies a single law—ORS § 243.666—to support his arguments that having a grievance adjusted and defending oneself in the disciplinary process are important public duties.  ORS § 243.666 provides, in relevant part, that "an individual employee or group of employees at any time may present grievances to their employer and have such grievances adjusted, without the intervention of the labor organization, if . . . [t]he adjustment is not inconsistent with the terms of a [CBA] then in effect[] and [t]he labor organization has been given opportunity to be present at the adjustment."  Or. Rev. Stat. § 243.666(2)(a)-(b).  This statute does not create any duty to perform a specific act because it does not "specifically encourage or require" an individual employee to present a grievance nor "otherwise demonstrat[e] that [an individual employee bringing a grievance is an action that] enjoy[s] high social value."  *Love*, 209 Or. App. at 486 (first and third alterations in original) (citation omitted).  The Court cannot create a relevant public duty, even if one is logical; the duty must be found in existing law and be "explicitly described as being of high social value[.]"  *Id.* at 487.  Plaintiff's wrongful discharge claim thus fails.

### 3.    *Remaining Arguments*

Plaintiff concedes that wrongful discharge is an interstitial tort but appears to argue that under *Kemp v. Masterbrand Cabinets, Inc.*, 257 Or. App. 530, 307 P.3d 491 (2013), a plaintiff may have "adequate federal remedies" but still proceed on a wrongful discharge claim where Congress has expressed an intention that the federal remedies do not displace a common law remedy.  Pl. Resp. 15-16 (citing *Kemp*, 257 Or. App. at 540).  Importantly, though, the *Kemp* court considered the adequacy of the remedies set

forth in Title VII, the plain text of which evinces Congress's "expressed intention" that Title VII not displace any common law remedy. 257 Or. App. at 540; *see* 42 U.S.C. § 2000e-7. Title VII does not apply in this case, and plaintiff points to no comparable language in section 1983 or the First or Fourteenth Amendments, nor has the Court found any, that might evince Congress' intention that the federal remedies available under those laws do not displace any common law remedy. Furthermore, this exact issue has been persuasively discarded by courts following *Kemp*. *See Wall v. Sentry Ins.*, No. 3:14-CV-01887-SI, 2015 WL 350683, at *3 (D. Or. Jan. 26, 2015) (collecting cases). Thus, plaintiff's reliance on *Kemp* on this point is misplaced.

Plaintiff also, relying on *Cantua v. Creager*, 169 Or. App. 81, 7 P.3d 693 (2000), argues that he "should be entitled to bring the wrongful discharge claim to a jury as an alternate theory of relief, even if the federal claims provide a more generous remedy[,]" and that any potential harm can be mitigated by a jury instruction that makes clear that damages cannot be awarded under both theories. Pl. Resp. 16 (citing *Ramona Manor Convalescent Hosp. v. Care Enters.*, 225 Cal. Rptr. 120, 129-31 (Cal. Ct. App. 1986); *AIG Ret. Servs., Inc. v. Altus Fin. S.A.*, 365 F. App'x 756, 761 (9th Cir. 2010)). This argument is unavailing. Plaintiff is correct that generally, parties may plead alternate theories of relief, and in some circumstances, juries may be provided limiting instructions directing that they do not make awards under both theories. However, these general propositions do not consider the difference in posture where one of the pleaded theories of relief is an interstitial tort. The only case cited by plaintiff that considered a wrongful discharge claim is *Cantua*, but that claim was decided on directed verdict and disposed of without regard to the court's *dicta* regarding a plaintiff's ability to plead alternate theories of relief to a jury pursuant to Oregon Rule of Civil Procedure 18. 169 Or. App. at 95 n.6 (noting point about pleading alternate theories of relief with regard to the plaintiff's contract claim). Plaintiff's argument fails.

**D.     Negligence *Per Se***

Plaintiff's negligence *per se* claim is set forth against all defendants and is based on allegations that defendants "negligently performed duties to investigate [and] report misconduct . . . and to hold police officers appropriately responsible[,]" and committed misconduct by "destroying an investigation, firing officers without a proper investigation, and intentionally not reporting nor [*sic*]

disciplining officers' dishonesty[.]"  FAC ¶¶ 76-77.  Defendants move to dismiss plaintiff's negligence *per se* claim on two independent bases: (1) this claim is barred by the workers compensation exclusivity rule, and (2) plaintiff fails to state a claim because he lacks standing.

       1.    *Workers Compensation Exclusivity Rule*

       Defendants first argue that plaintiff's negligence *per se* claim is barred by the workers compensation exclusivity rule because plaintiff's alleged injury "arise[s] out of the course and scope of [his] employment" and defendants, as an arm of the state, are entitled to sovereign immunity.  Defs. Mot. 20 (citation omitted).  Plaintiff responds that "[n]egligent investigation is not a claim that is covered under [w]orker's [c]ompensation, nor is [p]laintiff's alleged damages a 'compensable injury' under the [w]orker's [c]ompensation framework."  Pl. Resp. 18.

       "The Oregon Tort Claims Act ['OTCA'] . . . immunizes from liability '[e]very public body and its officers, employees and agents acting within the scope of their employment or duties' for '[a]ny claim for injury to or death of any person covered by any workers' compensation law.'"  *Crandall v. State*, 328 Or. App. 452, 454, 538 P.3d 212 (2023) (citing Or. Rev. Stat. § 30.265(6)(a)).  "[W]here . . . a plaintiff has a remedy for an injury under the Workers' Compensation Act, the application of ORS 30.265(6)(a) to preclude tort remedies against third-party state employees does not violate the remedy clause of Article I, section 10."  *Id.* (citing *Horton v. Or. Health & Scis. Univ.*, 359 Or. 168, 376 P.3d 998 (2016)).  If the plaintiff's injury is not covered by any workers' compensation law, then that person "generally has a cause of action for tort damages against the state, in lieu of a cause of action against an individual state employee, subject to a damages cap."  *Id.* at 459 (citing Or. Rev. Stat. § 30.265(1), (2); *Horton*, 359 Or. at 221-22).

       In *Moustachetti v. State*, the defendants asserted immunity against the plaintiff's wrongful discharge claim pursuant to a different subsection of ORS § 30.265.  319 Or. 319, 321, 877 P.2d 66 (1994).  The plaintiff had been employed as a psychiatric security aide, where he witnessed a supervisor abusing a resident; was required to testify before a grand jury regarding the events; and began to suffer headaches and sleeping problems as a result.  *Id.*  The plaintiff submitted a workers' compensation claim for "work-related 'stress,'" which claim was "accepted . . . as a non-disabling compensable injury[.]"  *Id.* at 322.  Soon

thereafter, the plaintiff's employer terminated his employment, and the plaintiff filed a civil action for wrongful discharge, asserting his termination was retaliatory. *Id.* The defendants argued that the plaintiff's injury arose out of his workers' compensation claim and the defendants were therefore entitled to sovereign immunity. *Id.* at 323. The Oregon Supreme Court expressly rejected this contention as "erroneous," writing that "[t]he legal 'injury' alleged in an action for wrongful discharge is *the discharge*, not the type or severity of the damages suffered as a result of the discharge." *Id.* at 325. In contrast, "[a] 'compensable injury' is an accidental injury . . . arising out of and in the course of employment requiring medical services or resulting in disability or death[.]" *Id.* (internal quotation marks omitted) (quoting Or. Rev. Stat. § 656.005(7)(a)).

Plaintiff's negligence *per se* claim is not barred by the workers compensation exclusivity rule. The first portion of the OTCA clause appears to be satisfied: defendants were acting within the scope of their employment or duties in conducting their investigation into plaintiff's actions. However, plaintiff's claim for injury does not appear to be "covered by any workers' compensation law." *Crandall*, 328 Or. App. at 454. Plaintiff asserts that defendants negligently investigated the allegations against him, thereby leading to his wrongful discharge. As in *Moustachetti*, "[t]he legal 'injury' alleged . . . is *the discharge*, not the type or severity of the damages suffered as a result of the discharge." 319 Or. at 325 (emphasis in original). Though *Moustachetti* analyzed immunity under subsection (3) of ORS § 30.265, and this case concerns subsection (6), the language analyzed is similar and the reasoning is persuasive as applied here. A negligent investigation, leading to a wrongful discharge, is not a "compensable injury" as defined by applicable workers' compensation laws. Thus, the workers compensation exclusivity rule does not bar plaintiff's negligence *per se* claim.

      2.    *Standing and Failure to State a Claim*

Defendants next argue that plaintiff's negligence *per se* claim fails because plaintiff lacks standing. Defendants' standing argument is built on two bases: (1) plaintiff's negligence claim relates to OSP's alleged failure to properly investigate and discipline Major A.H. and purports to challenge the investigation made into Major A.H.'s conduct, and (2) plaintiff has not stated any proper authority in support

of the claim. Plaintiff responds that (1) he is not alleging negligence with respect to the Major A.H. investigation, and (2) he has cited authority that, when read together, establishes that the State "had a duty which it violated through its investigation, the legislature impliedly intended [p]laintiff to have a private cause of action and [p]laintiff was a member of the group the Legislature intended to protect, and [p]laintiff suffered injury due to [the State's] actions." Pl. Resp. 19-20. As an initial matter, plaintiff concedes that his negligence *per se* claim is based on defendants' investigation into plaintiff, not defendants' investigation into Major A.H. (or any other OSP employee). Thus, to the extent that defendants' standing argument is based on the premise that plaintiff's negligence claim is grounded in defendants' investigation into Major A.H., this argument fails.

Negligence *per se* is a "shorthand descriptor for a negligence claim in which the standard of care is expressed by a statute or rule." *Moody v. Or. Cmty. Credit Union* ("*Moody II*"), 371 Or. 772, 781-82, 542 P.3d 24 (2023) (quoting *Deckard v. Bunch*, 358 Or. 754, 761 n.6 (2016)). Thus, plaintiff's negligence *per se* claim—regardless of what statute plaintiff asserts provides the appropriate standard of care—is grounded in a common law negligence claim, and to survive dismissal, plaintiff must have stated a claim of common law negligence. *See id.* at 782-83. To state a claim for common law negligence, a plaintiff must allege "(1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent." *Id.* at 784 (internal quotation marks omitted) (quoting *Solberg v. Johnson*, 306 Or. 484, 490-91, 760 P.2d 867 (1988)).

To state a claim for negligence *per se*, a plaintiff must plead that "(1) [the] defendants violated a statute; (2) [the] plaintiff was injured as a result of that violation; (3) [the] plaintiff was a member of the class of persons meant to be protected by the statute; and (4) [] the injury [the] plaintiff suffered is of a type that the statute was enacted to prevent." *Moody v. Or. Cmty. Credit Union* ("*Moody I*"), 317 Or. App. 233, 238, 505 P.3d 1047 (2022) (internal quotation marks omitted) (quoting *McAlpine v. Multnomah*

*County*, 131 Or. App. 136, 144, 883 P.2d 869 (1994)), *aff'd*, 371 Or. at 806.  Where a plaintiff adequately

pleads these elements, "noncompliance with the rule is negligence as a matter of law."  *Moody II*, 371 Or.

at 782 (internal quotation marks omitted) (quoting *Shahtout by & through Shahtout v. Emco Garbage Co.*,

298 Or. 598, 601, 695 P.2d 897 (1985)).

        In contrast to negligence *per se*, statutory liability "arises when a statute either expressly

or impliedly creates a private right of action for the violation of a statutory duty."  *Deckard*, 358 Or. at 759

(quoting *Doyle v. City of Medford*, 356 Or. 336, 344, 337 P.3d 797 (2014)).

> "[T]o prove a claim for statutory liability, the plaintiff must establish that: (1) a statute
> imposed a duty on the defendant; (2) the legislature expressly or impliedly intended to
> create a private right of action for violation of the duty; (3) the defendant violated the duty;
> (4) the plaintiff is a member of the group that the legislature intended to protect by imposing
> the duty; and (5) the plaintiff suffered an injury that the legislature intended to prevent by
> creating the duty."

*Id.* at 759-60.  Ultimately, "the determination of whether an enactment created statutory liability is a matter

of statutory interpretation; thus, when a statute prescribing a duty does not expressly indicate whether the

legislature intended to create statutory liability to enforce the duty, [the court] consider[s] whether such

intent is implied by examining 'the text, context, or legislative history of the statute creating the duty.'"  *Id.*

at 760 (citations omitted).

        Though some cases discuss negligence *per se* and statutory liability as though they are

interchangeable, *see McAlpine*, 131 Or. App. at 144, this is not so.  Negligence *per se* and statutory liability

are distinct causes of action that employ distinct tests: with negligence *per se*, "the test is whether the

plaintiff is a member of the class of persons for whose benefit the legislation was enacted and whether the

type of harm suffered was the kind the legislation was intended to prevent[,]" whereas with statutory

liability, "the test . . . is whether the legislature intended to create a tort action for statutory liability."  *White*

*v. United Heritage Prop. & Cas. Co.*, No. 3:21-cv-01524-JR, 2023 WL 2526137, at *11 (D. Or. Jan. 27,

2023) (internal quotation marks omitted) (quoting *Moody I*, 317 Or. App. at 243-44); *see Cain v. Bovis*

*Lend Lease, Inc.*, 817 F. Supp. 2d 1251, 1264 (D. Or. 2011) (internal quotation marks omitted) (quoting

*Shahtout*, 298 Or. at 600-01) ("Statutory torts are not 'negligence *per se*.'  The phrase 'negligence *per se*'

can apply only to cases brought on a theory of liability for negligence rather than liability grounded in obligations created by statute. Even when a statute neither expressly nor impliedly gives a person injured by its violation any claim for damages, the injured person may have such a claim under existing common law negligence theories. The statutory violation may be evidence of the common law negligence."). As such, "[w]hether the legislature intended its enactment of a law to create direct statutory liability does not preclude courts from determining that it is appropriate to treat the enactment as a standard of care for purposes of stating a claim for negligence per se." *White*, 2023 WL 2526137, at \*11 (internal quotation marks omitted) (quoting *Moody I*, 317 Or. App. at 243-44). As they are distinct causes of action, it logically follows that "a plaintiff may assert both statutory *and* common law theories of liability on the same facts." *Shahtout*, 298 Or. at 601 (citing *Nearing v. Weaver*, 295 Or. 702, 708, 670 P.2d 137 (1983)).

Plaintiff's negligence *per se* claim purports to be based on ORS §§ 181A.710(2) and 181A.681 and 43 U.S.C. § 1985(3). The allegations beneath the heading further reference ORS §§ 162.405, 659A.200 through 659A.224; Oregon Administrative Rule 839-010-0010; and *Brady v. Maryland*, 373 U.S. 83 (1963). Defendants argue that none of these cited authorities provide a private cause of action and that "[s]tatutory liability does not arise unless a 'statute either expressly or impliedly creates a private right of action for the violation of a statutory duty.'" Defs. Mot. 22 (quoting *Deckard*, 358 Or. at 759). Plaintiff responds that these authorities, when read together, impose a duty upon defendants that they violated by way of their negligent investigation.

The parties appear to conflate a claim for negligence *per se* with a claim for statutory liability. Their arguments do not center around the elements of a negligence or negligence *per se* claim but instead largely focus on whether any of the authorities cited create a private right of action. In this regard, defendants fail to recognize that "[e]ven when a statute neither expressly nor impliedly gives a person injured by its violation any claim for damages, the injured person may have such a claim under existing common law negligence theories." *Cain*, 817 F. Supp. 2d at 1264 (internal quotation marks and citation omitted). Nonetheless, plaintiff has not set forth sufficient allegations to state a negligence *per se* claim. Assuming without deciding that plaintiff has set forth sufficient allegations to satisfy the first two elements

39

of his negligence *per se* claim, plaintiff's claim nonetheless fails as to the third and fourth elements. Plaintiff

has not alleged either that he "was a member of the class of persons meant to be protected by the statute[s]"

or that "the injury plaintiff suffered is of a type that the statute[s] w[ere] enacted to prevent." *Moody I*, 317

Or. App. at 238. Thus, plaintiff has not set forth sufficient allegations to establish a negligence *per se* claim,

and dismissal of this claim is appropriate.

**E.    Attorney's Fees**

Defendants move to dismiss plaintiff's claim for attorney's fees because plaintiff seeks

attorney's fees related to his claims for wrongful discharge and negligence, both of which are common law

claims that provide no entitlement to attorney's fees. Plaintiff does not address defendants' arguments

regarding attorney's fees in his response.

Plaintiff cannot recover attorney's fees on his common law claims for wrongful discharge

and negligence *per se*. *See Dauven v. U.S. Bank Nat'l Ass'n*, No. CV-09-1471-PK, 2010 WL 2640119, at

*4 (D. Or. June 7, 2010), *report and recommendation adopted*, 2010 WL 2640115 (July 1, 2010) (alteration

in original) (quoting *Brookshire v. Johnson*, 274 Or. 19, 21, 544 P.2d 164 (1976) ("[I]n the absence of a

contractual or statutory provision a litigant is not entitled to attorney fees.")) (granting motion to strike

claim for attorney's fees where the "plaintiffs' prayer for relief seeks attorney['s] fees but [the] plaintiffs

have plead only common law causes of action that do not provide for an award of fees"). Should plaintiff

choose to amend, plaintiff must point to some contractual or statutory provision that entitles him to

attorney's fees on his claims for wrongful discharge and negligence *per se* or must omit the fee request from

these claims.

**CONCLUSION**

For the foregoing reasons, defendants' Partial Motion to Dismiss, ECF [13], is GRANTED. Plaintiff's first, second, fourth, and fifth claims for relief are DISMISSED without prejudice and with leave to amend. Plaintiff's third claim, brought under the Family Medical Leave Act, survives. If plaintiff believes he can remedy the deficiencies described, he may file a second amended complaint within thirty days of this opinion and order.

IT IS SO ORDERED.

DATED this 31st day of March, 2025.

Adrienne Nelson
United States District Judge